**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

———————————————————————————

DRAHCIR S. PARSON,

                    Plaintiff,

        v.                              No. 9:14-CV-1267
                                              (BKS/CFH)

INSPECTOR BARBOZA and
CAPTAIN MIKE GATES,

                    Defendants.

———————————————————————————

**APPEARANCES:**                                  **OF COUNSEL:**

DRAHCIR S. PARSON
917 Altamont Avenue
Schenectady, New York 12303
Plaintiff pro se

LEMIRE, JOHNSON LAW FIRM            GREGG T. JOHNSON, ESQ.
P.O. Box 2485                               APRIL J. LAWS, ESQ.
2534 Route 9
Malta, New York 12020
Attorneys for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

     Plaintiff pro se Drahcir S. Parson brings this action pursuant to 42 U.S.C. § 1983. Dkt.

No. 18 ("Am. Compl."). On October 15, 2014, Parson commenced this action with the filing

of a complaint. Dkt. No. 1. On November 26, 2014, Parson filed a motion to amend his

complaint. Dkt. No. 10. The Court granted Parson's motion in part and denied the motion

———————————————————————

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

in part[2] and directed defendant Inspector Marlo Barboza and Captain Mike Gates to respond to the allegations. Dkt. No. 17, 18. Presently before the undersigned is defendants' motion for summary judgment and dismissal of Parson's complaint pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56. Dkt. No. 27. Parson did not oppose the motion. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

## I. Failure to Respond

Parson failed to submit opposition to defendants' motion for summary judgment. Defendants notified Parson of the consequences of failing to respond. Dkt. No. 27 at 2-5. On December 18, 2015, the Court notified Parson that his response to defendants' motion was due on or before January 19, 2016. Dkt. No. 28. On January 27, 2016, the Court's notice was returned "unclaimed" and marked "unable to forward." Dkt. No. 33. On January 28, 2016, the Court issued a Text Order granting Parson an extension of time until February 29, 2016 to submit a response to defendants' motion. Dkt. No. 34. Thus, it is apparent that Parson was adequately apprised of the pendency of the motion and the consequences of failing to respond. However, "[t]he fact that there has been no response to a summary judgment motion does not . . . mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Even in the absence of a response,

---

[2] In its Decision and Order reviewing Parson's motion to amend, Dkt. No. 10, the Court denied as futile the motion to amend insofar as Parson attempted to assert the following claims: (1) harassment, (2) Equal Protection, and (3) retaliation. Dkt. No. 17. Further, this Court denied Parson's motion to amend insofar as Warren County as a defendant. See id. at 5-6. Although plaintiff's amended complaint, Dkt. No. 18, contains allegations regarding harassment, Equal Protection, and retaliation, and includes Warren County in the caption, as this Court denied Parson's motion to amend as to those claims/parties, the Court will review only those claims for which Parson was permitted to amend. Dkt. No. 17.

defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. Id.; FED. R. CIV. P. 56(c). Parson and defendants provide conflicting accounts of the events that transpired on August 12, 2014. Few facts are undisputed. Copies of portions of Parson's deposition transcripts were annexed as exhibits to defendants' motion. Dkt. No. 27-5, 27-6. Additionally, "[a] verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . "[3] Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted). Consequently, the facts set forth in defendants' Rule 7.1 Statement of Material Facts[4] are accepted as true, but only as to those facts that are not disputed by Parson's sworn testimony or facts set forth in the verified amended complaint. N.D.N.Y .L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis

---

[3] Plaintiff's amended complaint was properly verified by declaration under 28 U.S.C. § 1746. Dkt. No. 18 at 6; LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999) (holding that use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

[4] Local Rule 7.1(a)(3) states:

> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

omitted).

## II. Background

The facts recited are for the relevant time period as referenced in the complaint and are related herein in the light most favorable to Parson as the nonmoving party. <u>See</u> subsection III(A) <u>infra</u>. At the time of the incidents described in the amended complaint, Parson was confined in the Warren County Jail as a pretrial detainee ("Warren C.J."). Dkt. No. 18 at 3; Dkt. No. 27-5 at 3; Dkt. No. 27-12 at 15. Upon entry to the Warren C.J. on March 23, 2014, Parson received a handbook containing Warren C.J.'s rules and regulations. Dkt. No. 27-6 at 39-40.[5] On May 7, 2014, Parson was placed in Administrative Segregation following an incident that occurred in his housing unit. Dkt. No. 27-3 at 18. Parson subsequently received a Misbehavior Report and was charged with (1) violating a direct order to sleep on his bunk, and (2) creating a disturbance. <u>Id.</u> at 22. On May 11, 2014, after a disciplinary hearing related to the Misbehavior Report, Parson was sentenced to fifty days in keeplock, ending on June 29, 2014. <u>Id.</u> at 23. On July 16, 2014, Parson received a Misbehavior Report charging him with creating a disturbance, failing to obey an order, and insolence. <u>Id.</u> at 28. After a disciplinary hearing, Parson was sentenced to fifteen days in keeplock, ending on August 2, 2014. Dkt. No. 27-3 at 29, 30.

On August 12, 2014, defendant Barboza entered the C-Pod unit to assist with the transport of a male inmate. Dkt. No. 27-10 at 2. Parson was in his cell, "lingering" at his window, watching the transport. Dkt. No. 27-5 at 7. Barboza told the inmates to lock into

---

[5] Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

their cells and sit on their bunks.  Id. at 6-7; Dkt. No. 27-10 at 2-3.  While the male inmate

was being transported from the C-Pod, Barboza approached Parson's cell and ordered

Parson to leave his window and sit on his bunk.  Dkt. No. 27-5 at 9-10.  Barboza then asked

Officer Jordan Pond ("Pond") to open Parson's cell door.[6]  Dkt. No. 27-5 at 12; Dkt. No. 27-

10 at 3.  Barboza directed Parson to exit his cell but did not enter Parson's cell.  Dkt. No.

27-5 at 12.[7]

Parson exited his cell and followed Barboza to the door of C-Pod.  Dkt. No. 27-5 at 13-

14.  Barboza directed Parson to face the wall of C-Pod.[8]  Dkt. No. 27-5 at 14.  In an attempt

to restrain Parson, Barboza "took him to the ground by using her body weight."  Dkt. No. 27-

10 at 4.  While Parson was on the ground, Barboza called for assistance from Pond.[9]  Dkt.

No. 27-5 at 17; Dkt. No. 27-10 at 4.  Parson was placed in handcuffs and told Barboza that

---

[6]  Pond is not a defendant herein.

[7]  The events that subsequently transpired are largely disputed.  Parson asserts that as the other
inmate was escorted out of the pod, he was sitting on his bunk and followed "a direct order."  Dkt. No. 27-5 at
8.  Parson also contends that he was seated on his bunk when Barboza arrived at his cell door.  Id. at 10-11.
Conversely, Barboza contends that, while the other inmate was being transported, she observed Parson
standing next to his cell door, despite her direct order, and he only began to walk toward his bunk as she
approached his cell door.  Dkt. No. 27 at 3. Barboza contends that when she asked Parson "if he understood
my direct orders," Parson said, "'does it fucking look like it, I'm sitting on my fucking bunk?'"  Dkt. No. 27-10
at 3.

[8]  There is a factual dispute surrounding the events that occurred after Parson was directed to face
the wall.  Parson claims that he was following orders when Barboza grabbed him by the neck and "slam[med]
[him] backwards" onto his back.  Dkt. No. 27-5 at 15-16.  Conversely, Barboza claims that Parson would not
comply with her orders and when she attempted to move him, and she felt his "arm muscles tense" in an
effort to resist.  Dkt. No. 27-10 at 3-4.  After feeling Parson tense, Barboza "feared" that Parson would
attempt to "overpower" her so she took him to the ground "using her body  weight."  Id. at 4.

[9]  The events that transpired after Pond responded are in dispute.  Barboza claims that she was
unable to apply handcuffs due to Parson's attempts to resist.  Dkt. No. 27-10 at 4.  Barboza called Pond to
assist.  Id.  Once Parson was on his stomach, Parson complied with orders to place his hands behind his
back and Pond applied handcuffs.  Id.  Parson claims that he was not resisting and asserts that Barboza was
on top of him, "tugging" his right pinky finger.  Dkt. No. 27-5 at 17-18.  Parson contend that when Pond
arrived, he took Parson's left hand and applied handcuffs, without resistance.  Id.

he intended to file a lawsuit against her.  Dkt. No. 27-5 at 19; Dkt. No. 27-6 at 25.

An hour after the incident, Parson received medical attention.  Dkt. No. 27-5 at 22; Dkt. No. 27-3 at 45.  Parson complained of pain in his neck, low back, and right pinky finger due to being "thrown to the ground."  Dkt. No. 27-3 at 45.  A nurse examined Parson and found that he displayed good range of motion in his neck and arms and noted the absence of swelling in his neck, back, and pinky finger.  Id.  The nurse was able to move Parson's finger without difficulty and noted that Parson was able to "hop[] right up on [the] examining table [without] assistance."  Id.  Parson denied experiencing any numbness, loss of consciousness, or impact to his head.  Dkt. No. 27-3 at 45.  The nurse provided painkillers, an ice pack, and a heating pad.  Dkt. No. 27-5 at 22.

On August 12, 2014, Barboza issued a Misbehavior Report charging Parson with failure to obey, language, assault and "related offenses."  Dkt. No. 27-3 at 41-42.  The report was delivered to Parson but he refused to sign the acknowledgment.  Id.  Also on August 12, plaintiff filed a grievance regarding the incident with defendant Barboza.  Id. at 46.  On August 19, 2014, the grievance coordinator determined that Parson's claims of being assaulted by Barboza were "unfounded" and that Parson "did receive medical attention in a [sic] appropriate amount of time following his request."  Id. at 48.  Parson appealed this determination.  Id.  On August 28, 2014, the Chief Administrative Officer affirmed.  Id.  On November 18, 2014, the Citizen's Policy and Complaint Review Council "reviewed the above grievance . . . and voted to deny the grievance . . . sustain[ing] the action taken by the facility administration."  Id. at 52.

On August 13, 2014, at 6:30 p.m., Parson completed a sick call request, complaining that his pinky was swollen.  Id. at 53.  Later that evening, Parson was treated by a nurse

and received a prescription for Motrin.  Id.  On August 24, 2014, Parson received notice of his disciplinary hearing related to the August 12, 2014 incident.  Dkt. No. 27-3 at 39. Parson was directed to provide the Hearing Sergeant with a list of witnesses and questions. Id.  Parson was advised that Barboza would be called as a witness, and that the Hearing Sergeant intended to ask Parson questions.  Id.  On August 29, 2014, the Hearing Officer forwarded a memorandum to Parson indicating that at 9:00 a.m., he contacted Parson's requested inmate witnesses and they refused to testify at the disciplinary hearing.  Dkt. No. 27-3 at 40.  At 1:00 p.m., the disciplinary hearing commenced.  Id. at 36-37.  As a result of the hearing, Parson was sentenced to fifty days in keeplock beginning on August 30, 2014 and terminating on October 18, 2014.  Id.  Parson's television privileges were suspended, and he was allowed one hour of recreation each day, one shower per day, and two phone calls per week.  Id.  On September 8, 2014, defendant Gates issued Parson a memorandum regarding his appeal of his disciplinary sentence.  Dkt. No. 27-3 at 38.  Gates reviewed the materials in the file, discussed the matter with the Hearing Officer, and upheld the determination.  Dkt. No. 27-3 at 38.  Gates found no basis on which to amend or reduce the verdict rendered.  Id.

On October 4, 2014, Parson completed a sick call request, complaining that he felt like he was "losing [his] mind" and asked to "talk to someone professional."  Dkt. No. 27-3 at 200.  On October 5, 2014, a specialist from the Behavioral Health Unit met with Parson in response to his request.  Dkt. No. 27-3 at 200, 202.  Parson claimed that his "needs could not be met" as a result of this meeting.  Id. at 200.  On October 6, 2014, Parson received a Misbehavior Report related to the meeting, charging Parson with "insolence."  Id. Specifically, the Corrections Officer who issued the report claimed that Parson made

disrespectful comments toward the specialist insofar as he called her a "bird ass bitch."[10] Id. at 203.

From March 2014 until November 2014, Parson received fifty-four Misbehavior Reports charging him with, among other things, damaging property, failure to obey orders, using foul language, insolence, being disrespectful to staff, lack of cleanliness, and harassment.[11] See generally Dkt. No. 27-3. Parson also received four Misbehavior Reports charging him with throwing feces and urinating into food containers that he pushed into in the common hallway. Dkt. No. 27-6 at 29, 37; Dkt. No. 27-3 at 141-42, 169-70, 176-77, 256-57. Approximately forty-nine disciplinary hearings were held, resulting in the imposition of various penalties, including keeplock confinement, loss of commissary, loss of telephone privileges, and loss of visits. See generally Dkt. No. 27-3.

### III. Discussion[12]

In the amended complaint, Parson alleges that (1) Barboza used excessive force during the August 12, 2014 incident; (2) Gates acted with deliberate indifference to Parson's mental health and physical safety; and (3) Gates violated Parson's Fourteenth Amendment right to due process with "summary punishment" and "segregative confinement." See generally Dkt. No. 18. Defendants contend that Parson's (1) excessive force claims must

_____

[10] A copy of the report was left with Parson but he refused to sign the acknowledgment. Dkt. No. 27-3 at 203.

[11] The Misbehavior Reports are part of the record herein. See generally Dkt. No. 27-3.

[12] Copies of unpublished opinions cited to by the undersigned in this Report-Recommendation and Order are, unless otherwise noted, provided to plaintiff as an attachment to this Report-Recommendation and Order.

fail because the video evidence and Parson's "pattern of disrespect and insolence" prove

that no rational factfinder would find in Parson's favor; (2) medical indifference claim against

Gates is subject to dismissal because Parson received medical treatment within an hour of

the August 12 incident; and (3) Fourteenth Amendment due process claims against Gates

lack merit.  <u>See</u> Dkt. No. 27-12.  Alternatively, defendants claim that they are entitled to

qualified immunity.  <u>See</u> <u>id.</u> at 27-28.


## A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any

material fact, it was supported by affidavits or other suitable evidence, and the moving party

is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The moving party has the

burden to show the absence of disputed material facts by providing the court with portions

of pleadings, depositions, and affidavits which support the motion.  FED R. CIV. P. 56;

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the

outcome of the case as determined by substantive law.  <u>Anderson v. Liberty Lobby, Inc.</u>,

477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences drawn

in favor of the non-moving party.  <u>Skubel v. Fuoroli</u>, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine

issue for trial, and must do more than show that there is some doubt or speculation as to

the true nature of the facts.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475

U.S. 574, 586 (1986).  For a court to grant a motion for summary judgment, it must be

apparent that no rational finder of fact could find in favor of the non-moving party.  <u>Gallo v.</u>

<u>Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994); <u>Graham  v.</u>

Lewinski, 848 F.2d 342, 344 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest,". . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law"

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48.

## B. Fourteenth Amendment

Parson was a pretrial detainee during the relevant time period; therefore, Parson's excessive force and deliberate indifference claims must be analyzed under the Fourteenth Amendment's due process clause. See, e.g., Bell v. Wolfish, 441 U.S. 520, 535 n.16

10

(1979).  The due process clause provides that "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  Id. at 535-36 (citations omitted).

## 1. Excessive Force

Parson claims that on August 12, 2014, Barboza used excessive force against him in violation of his constitutional right to be free from cruel and unusual punishment.  Dkt. No. 18 at 5.[13]  Defendants contend that video evidence establishes that the use of force was reasonable.  Dkt. No. 27-12 at 17-18.   Defendants also assert that Parson's testimony proves that he was a threat, and, thus, there was a legitimate need to use the force necessary to control him.  Id. at 18.

Pretrial detainees, like other inmates, enjoy protection against the use of excessive force and may recover damages for its violation under 42 U.S.C. § 1983.  Hudson v. McMillian, 503 U.S. 1, 9-10 (1992).  The Fourteenth Amendment due process clause protects pretrial detainees from "the use of excessive force that amounts to punishment." Kingsley v. Hendrickson, ___U.S.___, 135 S.Ct 2466, 2473 (June 22, 2015) (citing Graham v. Connor, 490 U.S. 386, 395 n.10 (1989)).[14]  To bring a claim of excessive force under

---

[13]  Defendants argue that Parson improperly bases his excessive force claims on the Eighth Amendment rather than the Fourteenth Amendment.  Dkt. No. 27-12 at 15.  However, a review of the Amended Complaint shows that, although Parson references a right to be free from "cruel and unusual punishment," he does not explicitly rely on the Eighth Amendment, and, in fact, references the Fourteenth Amendment due to his status as a pretrial detainee.  Dkt. No. 18 at 5.  Regardless, even if Parson erroneously relies on the Eighth Amendment, given the special solicitude due to him as a pro se plaintiff, the Court would interpret the claim as if brought pursuant to the Fourteenth Amendment.

[14]  Defendants' submissions refer to the objective/subjective standard that was applied to pre-trial detainees' excessive force claims pre-Kingsley, but offer no argument as to why this standard would apply post-Kingsley.  See generally Dkt. No. 27-12 at 16-19.

section 1983, "a pretrial detainee must only show that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim." Kingsley,135 S.Ct at 2473. "[I]f the use of force is deliberate – i.e., purposeful and knowing – the pretrial detainee's claim may proceed." Id. Thus, a pretrial detainee can make a showing if the force "was taken with an 'expressed intent to punish" or "by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental purpose or that it is excessive in relation to that purpose." Id. at 2473 (citing Block v. Rutherford, 468 U.S. 576, 585-86 (1984) (additional citation omitted)).

In applying the due process standard, a Court "must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Kingsley, 135 S.Ct at 2473-74 (quoting Graham, 490 U.S. at 396). Additionally, "a court must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." Id. at 2476. Despite the fact that

> objective reasonableness depends on the facts and circumstances of each case, courts may consider a number of factors, including: The relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Musaid v. Manka, 13-CV-7880 (PKC) (MHD), 2016 WL 540806, at *4 (S.D.N.Y. Feb. 9, 2016) (quoting Kingsley, 135 S.Ct. at 2473).

Viewing the facts in the light most favorable to Parson, defendants fail to show the

absence of a genuine issue of material fact to warrant summary judgment as to this cause of action. Parson, Barboza, and Pond posit contrary recitations of fact with regard to the August 12, 2014 incident. Barboza claims that she decided to transfer Parson to Administrative Segregation due to the fact that he continually disregarded her orders to sit on his bunk. Dkt. No. 27-10 at 3. Barboza asserts that as she escorted Parson through the C-Pod, she directed him to face the wall because she did not want him interacting with the inmate being transported from C-Pod. Id. When Parson refused to comply, Barboza placed her hand on his arm and "immediately felt him tense arm muscles in an effort to resist." Id. at 4. Barboza claims that she attempted to move Parson and that he "quickly began to turn around." Id. Barboza feared that Parson would attempt to strike or overpower her and used her body weight to take him to the ground." Dkt. No. 27-10 at 4. Barboza contends that Parson ignored commands and resisted efforts to put his hands behind his back. Id. Barboza attempted to pull Parson's hand to place handcuffs on. Id. Barboza called for Pond to assist and once they had Parson on his stomach, Parson complied. Id.

Pond claims that as Barboza approached Parson's door, she asked Parson whether he understood her orders. Dkt. No. 27-11 at 2. When Pond opened Parson's door, he heard Parson say, "does it [expletive] look like it? I am sitting on my bunk." Id. Pond asserts that when Parson exited his cell with Barboza, he walked "in an aggressive manner" and became defiant when he was asked to face the wall. Id. Pond observed Parson "physically resist" Barboza's attempt to move Parson to the place where he was directed to stand. Id. Pond "saw Inspector Barboza take Inmate Parson to the ground and try to control him." Dkt. No. 27-11 at 2. Pond further maintains that while Parson was on the ground, Parson

disregarded orders and attempts to restrain him.  Id. at 2-3.  As a result, Pond claims that

he grabbed Parson's legs, turned him onto his stomach, and "mounted his back" to keep

Parson under control.  Dkt. No. 27-11 at 3.  Pond contends that he placed handcuffs on

Parson and brought him to his feet in a "controlled manner."  Id.

Conversely, Parson maintains that while he was facing the wall, Barboza screamed at

him, grabbed his neck, and slammed him to the floor onto his back.  Dkt. No. 27-5 at 15-16.

Parson claims that Barboza grabbed and tugged his right "pinky" finger while she restrained

him.  Id. at 16, 18.  Parson alleges that he was already down on the ground, subdued, and

not resisting, when Pond approached.  Id. at 17.  Further, Parson maintains that he obeyed

all of Barboza's orders.  Id. at 10-11, 13, 14; Dkt. No. 27-6 at 13-14.

This competing evidence rests on the credibility of Parson on one hand and Barboza

and Pond on the other.  In these circumstances, the governing law that the evidence must

be viewed in the light most favorable to the non-moving party requires the Court to credit

Parson's version of the events for purposes of this motion.  See In re Dana Corp., 574 F.3d

129, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment

must draw all reasonable inferences in favor of the non-moving party and may not make

credibility determinations or weigh the evidence, functions which are reserved to the trier of

fact) (citing cases).

In support of the motion for summary judgment and dismissal of the excessive force

claim, defendants also rely upon video evidence.[15]  "[W]here the nonmoving party's version

of the facts is 'blatantly contradicted' by the 'existence in the record of a videotape capturing

---

[15] Parson does not challenge the authenticity of the video.

14

the events in question,' then the 'court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.' " Merring v. The Town of Tuxedo, N.Y., No. 07 CV 10381, 2009 WL 849752, at *10 (S.D.N.Y. Mar. 31, 2009) (citation omitted). Here, the video evidence does not "so utterly discredit" Parson's version of events. See id. (citing Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007)). Although defendants contend that the video "directly contradicts Plaintiff's testimony in the manner in which he was brought to the ground by Insp. Barboza," the video evidence does not resolve issues of fact to the point that no rational finder of fact could find in favor of Parson. Dkt. No. 27-12 at 20. First, the video is not accompanied by any audio. Further, the video does not show: (1) Parson and what he was doing before he was asked to exit his cell; (2) how Parson ended up on the ground; and (3) how Barboza and Pond applied restraints. Whether Barboza's use of force was excessive or a de minimis attempt to subdue Parson is an issue for the trier of fact to determine. See Dkt. No. 27-2 ("Exh. A"); Mack v. Howard, No. 11-CV-0303-A (F), 2014 WL 2708468, at *10-12 (W.D.N.Y. June 16, 2014) (holding that although the video evidence of the use of force incident: (1) suggests that the defendants slammed the plaintiff, it may be that the defendants were attempting to restrain him when he was struggling, and (2) depicts the plaintiff pacing and kicking a door with his allegedly injured leg, there was medical testimony that an "adrenaline rush would have temporarily masked the pain"; thus, it was necessary for the video to be viewed by the trier of fact for a factual determination of what was depicted) (citing Redd v. New York Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012)).

Defendants also cite to Parson's continued misbehavior in support of summary judgment and dismissal of the excessive force claims. Dkt. No. 27-12 at 9-13. Prior to the

15

August 2014 incident, Parson received three Misbehavior Reports charging him with failure to obey an order to sleep in his bunk, talking to "locked-in" inmates, and shouting. Dkt. No. 27-3 at 22, 26, 28. Although Parson's disciplinary history prior to the incident is a consideration when assessing the objective reasonableness of defendants' use of force, Kingsley, 135 S.Ct. at 2473, Parson's disciplinary history is just one factor of many factors to consider and, as discussed, there are genuine issues of material fact to be presented to a trier of fact on several of the other relevant factors.

In sum, because there are several material questions of fact, the question of whether Barboza used excessive force against Parson cannot be resolved by a motion for summary judgment. Accordingly, it is recommended that defendants' motion, insofar as it relates to this claim, be denied.

### 2. Deliberate Indifference to Medical Needs

Parson alleges that Gates was deliberately indifferent to his medical and mental health needs. Dkt. No. 18 at 6. Parson admits that he was treated an hour after the incident on August 2014 but alleges that he submitted a sick call slip the next day and the request was "totally ignored." Id. at 3. Parson also contends that he did not receive X-rays and that his hand was swollen for one week after the incident. Id. Parson alleges that Gates was deliberately indifferent to his medical needs due to his failure to train and supervise officers who "abuse detainees and prisoners." Id. at 6. Defendants claim that Parson was provided with medical and mental health treatment when appropriate and requested. See Dkt. No. 27-12 at 25.

A claim for deliberate indifference to serious medical needs has two necessary

components, one objective and the other subjective.[16] <u>See</u> <u>Hathaway v. Coughlin</u>, 99 F.3d 550, 553 (2d Cir. 1996). The objective component asks whether the deprivation about which the plaintiff complains was sufficiently serious. <u>Farmer</u>, 511 U.S. at 834. Deprivation of medical treatment is "sufficiently serious" if the injury is one where there is, "a condition of urgency, one that may produce death, degeneration, or extreme pain." <u>Hathaway</u>, 37 F.3d at 66 (internal citation omitted). "'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. <u>Smith v. Carpenter</u>, 316 F.3d 178, 184 (2d Cir. 2003) (quoting <u>Hudson</u>, 503 U.S. at 9). Although there is no bright-line rule to determine whether a medical condition is sufficiently serious, the Second Circuit has identified several factors that are highly relevant to the inquiry such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" <u>Brock v. Wright</u>, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing <u>Chance v. Armstrong</u>, 143 F.3d 698, 702 (2d Cir. 1998) (internal citation omitted)). This component "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary

---

[16] Although the Supreme Court concluded that a solely objective standard was to be applied in excessive force cases brought by a pretrial detainee under the Fourteenth Amendment, courts in this Circuit have declined to extend the objective-only analysis to deliberate indifference claims brought by pretrial detainees. <u>Roberts v. C-73 Medical Director</u>, 14-CV-5198 (GHW), 2015 WL 4253796, n.3 (S.D.N.Y. July 13, 2016) ("The decision in <u>Kingsley</u> dealt only with excessive force claims, thus the Court continues to abide by Second Circuit precedent setting force a subjective standard for cases involving allegations of deliberate indifference to a pretrail detainee's serious medical needs , which is identical to the standard for convicted prisoners under the Eighth Amendment."); <u>Woodhouse v. City of Mount Vernon, et al.</u>, 13-CV-189 (ALC) (HBP), 2016 WL 354896, at *10 n.4 (S.D.N.Y. Jan. 27, 2016) (same). The undersigned follows this logic here, and declines to extend the Supreme Court's reasoning to claims brought for deliberate indifference to serious medical needs.

standards of decency to expose *anyone* unwillingly to such a risk." <u>Helling v. McKinney</u>, 509 U.S. 25, 36 (1993). Thus, the plaintiff must show that "the risk of which he complains is not one that today's society chooses to tolerate." <u>Id.</u> at 36.

The subjective component requires the inmate to show that the defendant demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. <u>Farmer</u>, 511 U.S. at 834. The Supreme Court of the United States has held that, "[w]hether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in <u>Estelle [v.Gamble]</u>." <u>Wilson v. Seiter</u>, 501 U.S. 294, 303 (1991). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837. Thus, a plaintiff must allege that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. <u>Farmer</u>, 511 U.S. at 837; <u>Chance</u>, 143 F.3d at 702. The plaintiff must also demonstrate that the provider consciously and intentionally disregarded or ignored that serious medical need. <u>Farmer</u>, 511 U .S. at 835. A prison official acts with a culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837. "Deliberate indifference requires more than negligence but less than conduct undertaken for the very

18

purpose of causing harm." Hathaway, 37 F.3d at 66.

Moreover, "mere disagreement over proper treatment does not create a constitutional claim . . . " as long as the treatment was adequate. Chance, 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Services, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

Here, even assuming that Parson's medical and mental conditions were sufficiently serious to establish the objective element of the analysis, Parson's conclusory allegation that Gates was "deliberate[ly] indifferen[t] to his mental health . . . and medical needs," is not supported by admissible proof. Dkt. No. 18 at 4, 6. Parson does not present any evidence that he requested and was denied medical or mental health treatment. Indeed, the record belies Parson's claims that Warren C.J. staff "abuse[d]" him. Id. at 6. Following the August 12, 2014 incident, Parson was treated by a nurse within an hour of the use of force incident. Dkt. No. 27-5 at 22; Dkt. No. 27-3 at 45. On August 13, 2014, Parson completed a sick call request and was treated the same day. Dkt. No. 27-3 at 53. On October 4, 2014, Parson completed a sick call request for mental health treatment. Dkt. No. 27-3 at 200. The next day, Parson met with a behavioral health specialist. Id. at 200, 202. A one-day delay in providing medical treatment does not amount to a constitutional violation, especially where it is not shown that the delay was intentional. See, e.g., Rosario v. Anson, 12-CV-1506 (BKS/CFH), 2015 WL 5692550, at *11 (N.D.N.Y. Sept. 28, 2015) (holding that "a three-day wait for medical care is not the type of delay that constitutes

deliberate indifference.") (citation omitted).[17]   Parson's "dissatisfaction" with his level of care, including the lack of x-rays, the "hostility" exhibited by the mental health counsel, and course of treatment does not support a finding of deliberate indifference.  See Soto v. Wright, No. 11 Civ. 2289, 2013 WL 474291, at *5 (S.D.N.Y. Feb. 1, 2013) (citation omitted). Parson does not identify any physician, health care provider or any other individual responsible for any delay or deprivation of medical treatment.

Significantly, there is no evidentiary support for any medical indifference claim against Gates.  "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

---

[17]  Insofar as Parson may suggest that a sick call slip was "totally ignored[,]" the record demonstrates that he received medical treatment the same day of the incident in question.  Dkt. No. 18 at 3.

323–24 (2d Cir. 1986)).

The record lacks evidence establishing that Gates was personally involved in any decision related to Parson's medical care. Gates involvement is limited to his denial of Parson's appeal of his disciplinary sentence related to the August 2014 incident. Id. at 38. During Parson's confinement at Warren C.J., he filed several grievances. Dkt. No. 27-3 at 24, 25, 46, 54, 64, 71, 126, 220, 284. There is no evidence establishing that Gates was involved in the resolution or investigation of any grievance. See Dkt. No. 27-3 at 50 (grievance investigation form). Moreover, the grievances did not relate to Parson's medical or mental health treatment. Parson does not present any evidence from which a reasonable fact finder could conclude that Gates was deliberately indifferent to his medical needs and acted with a "sufficiently culpable mental state." See Salahuddin v. Goord, 467 F.3d 263, 282 (2d Cir. 2006).

Accordingly, the undersigned recommends that defendants' motion for summary judgment be granted on this ground.

### 3. Due Process

Parson claims that his due process rights were violated when he was placed in "segragative [sic] confinement keeplock[18] for a year and [he has] not even been found guilty or sentenced in criminal court for the crime I'm detained for." Dkt. No. 18 at 3. Parson also contends that for six months, he was limited to two visits, one of two phone calls per week,

---

[18] "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6.

loss of commissary, and deduction of funds from his inmate account. Dkt. No. 18 at 3-4.

Defendants concede that Parson was placed in the Special Housing Unit ("SHU"),[19] but

contend that such placement was due to his "repeated disregard of WCCF rules and

regulations." Dkt. No. 27-9 at 4; 27-12 at 26.[20]

"'In a pretrial detainee's challenge to the conditions of confinement under the

Fourteenth Amendment, the proper inquiry is whether those conditions amount to

punishment of the detainee." <u>Moran v. Livingston</u>, 10-CV-6178 (EAW), 2016 WL 93402, at

*7, __ F. Supp. 3d__ (W.D.N.Y. Jan. 7, 2016) (citation omitted); <u>see</u> <u>also</u> <u>Benjamin v.</u>

<u>Fraser</u>, 264 F.3d 175, 188 (2d Cir. 2001) (holding that a pretrial detainee's "liberty interest in

freedom from restraint is highly qualified and must be balanced against the state's reasons

for restraining that liberty [;thus,] restrictions on pretrial detainees . . . may not amount to

punishment . . .") (internal citations and quotation marks omitted).[21] However, a pretrial

detainee's due process rights "are not absolute; they are subject to reasonable limitation or

retraction in light of the legitimate security concerns of the institution." <u>Bell</u>, 411 U.S. at 554.

"'[P]rocedural due process questions [are analyzed] in two steps: the first asks whether

---

[19] SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. <u>Id.</u> at pt. 301.

[20] Although the record indicates that Parson was in keeplock confinement, and Gates' affidavit provides that plaintiff was in keeplock confinement, defendants do not differentiate between these periods of confinement and do not address keeplock confinement at all in their memorandum of law.

[21] Defendants apply the standard set forth in <u>Sandin v. Conner</u>; however, as this District has noted, "[u]nlike convicted prisoners, who must satisfy the standard of 'atypical and significant hardship' outlined in <u>Sandin v. Conner</u>, 515 U.S. 472 (1995), a pretrial detainee need not meet such a stringent standard because '[a] detainee's interest in freedom from unjustified infliction of pain and injury is more substantial . . .'" <u>Osgood v. Amato</u>, 12-CV-565 (TJM/CFH), 2014 WL 3777189, at *10 (N.D.N.Y. July 17, 2013) (quoting <u>Sandin</u>, 515 U.S. at 188-90); <u>Benjamin v. Fraser</u>, 265 F.3d 175, 188-91 (2d Cir. 2001).

22

there exists a liberty or property interest which has been interfered with by the state; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" Osgood, 2013 WL 3777189, at *10 (quoting Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994)). "'Aside from any state policy or regulation, the force of the Due Process Clause itself protects pre-trial detainees from restrictive confinement." Id. (citation omitted).

This Court has clearly laid out the factors to consider when assessing a Fourteenth Amendment procedural due process challenge:

> '[w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only after a finding of *scienter*, whether its operation will promote the traditional aims of punishment – retribution or deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable . . . and whether it appears excessive in relation to the alternative purpose assigned . . .['] Bell, 441 U.S. at 537-38 (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 166-69 (1963)).
>
> [']Absent a showing of an expressed intent to punish, the determination whether a condition is imposed for a legitimate purpose or for the purpose of punishment generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it. Thus, if a particular condition or restriction of pretrial detention is reasonably related to legitimate governmental objective, it does not, without more, amount to punishment. Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees . . . .['] Id. at 538-39.

Osgood, 2013 WL 3777189, at *11 (additional citation omitted).

From May 11, 2014 until August 3, 2014, Parson was in SHU or keeplock

confinement, totaling approximately sixty-five days.  Dkt. No. 27-3 at 23, 29; 27-9 at 4.[22]  On

August 12, 2014, Parson was placed in the SHU, where he remained until his transfer to a

"maximum security state housing facility" in December 2014.  Dkt. No. 27-9 at 2, 4.[23]  This

Court has previously held that placement in keeplock confinement or SHU "indicates a

liberty interest requiring procedural due process protections."  Osgood, 2013 WL 3777189,

at *13; Allen v. Amato, 12-CV-534 (TJM/CFH), 2013 WL 521105, at *11 (N.D.N.Y. Sept. 1,

2013) ("As a pretrial detainee, the Due Process Clause provides a liberty interest in

remaining free from restrictive confinement.").  Thus, Parson has a liberty interest in being

free from segregative confinement.

      Thus, it must next be assessed whether Parson was provided with sufficient procedural

protections prior to his placement in segregative confinement.  The Second Circuit has held

that "procedural due process requires that pretrial detainees can only be subjected to

segregation or other heightened restrains if a predeprivation hearing is held to determine

whether any rule has been violated."  Johnston v. Maha, 606 F.3d 39, 41 (2d Cir. 2010).  If

the intent behind the segregative confinement of the pretrial detainee is punitive in nature, it

is governed by the standard in Wolff v. McDonnell, 418 U.S. 539 (1974).  Wolff requires (1)

written notice of the charges against the detainee to be provided to the detainee at least

---

[22]  Defendant Gates' affidavit provides that Parson was in SHU on May 7, 2014, July 16, 2014, and
August 12, 2014 until he was transferred out of the Facility.  Dkt. No. 27-9 at 4.  However, elsewhere in the
record, filings indicate that plaintiff was sentenced, following disciplinary hearings, to periods of keeplock
confinement: fifty days in keeplock beginning May 11, 2014 until June 29, 2014; on May 16, 2014, received
one day of keeplock, time served, from May 12 to May 13, 2014; and fifteen days of keeplock, ending August
3, 2014 .  Dkt. No. 27-3 at 23, 27, 29.  It is unclear whether the SHU confinement to which Gates refers is
something separate from the periods of keeplock confinement assigned following the disciplinary hearings.
As noted, plaintiff refers only to keeplock confinement.

[23]  Gates provides that plaintiff was placed in SHU on May 7, 2014 and July 16, 2014, but does not
provide the length of these SHU stays.  Dkt. No. 27-9 at 4.

twenty-four hours prior to a disciplinary hearing; (2) a written statement of the factual allegations made against the detainee; and (3) "a limited ability to present witnesses and evidence." Benjamin, 264 F.3d at 190; Best v. New York City Dep't of Corr., 14 F. Supp. 3d 341, 348 (S.D.N.Y. 2014)(citations and quotation marks omitted) (noting that "full adversary proceedings are not required for disciplinary deprivations of liberty in the prison setting."). The question whether the confinement is imposed "'for a legitimate purpose or for purpose of punishment 'generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" Benjamin, 264 F.3d at 188 (quoting Youngberg v. Romeo, 457 U.S. 307, 316 (1982)).

If the segregation was administrative and not punitive, a "less protective" standard applies requiring "only that the pretrial detainee receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to impose the restraint." See Best, 14 F. Supp. 3d at 348, 376 (citing Hewitt v. Helms, 459 U.S. 460 (1983) (internal quotation marks and additional citation omitted)). Courts have held that disciplinary confinement of a pretrial detainee often amounts to punishment. See Best, 14 F. Supp. 3d at 348 (noting that courts within the Second Circuit have held that "'special confinement based on a disciplinary violation rings of punishment . . . .'"). Courts have held that segregative confinement "rings particularly loudly [of punishment] when at least one of the disciplinary violations with which the pretrial detainee is charged is non-violent in nature, which suggests that the detainee's special confinement is not based on a 'legitimate penological reason, such as the safety and security of other inmates or prison staff.'" Id.

25

Here, neither party addresses which standard should be applied; as such, there is no explicit argument before the Court as to whether Parson's time in segregative confinement while at Warren C.J. was administrative or punitive. Neither party argues that the segregation was administrative in nature, and the record would not suggest as such. Review of the pleadings and record indicates that Parson's confinement in keeplock and SHU were punitive because he was placed in such confinement for violation of prison disciplinary rules. Furthermore, although Parson was allegedly charged with violence or threats of violence on September 1, September 11, September 26, and November 29, 2014;[24] and assaulting staff on August 12 and September 10, 2014, Dkt. No. 27-9 at 3, the remainder of the many misbehavior reports issued did not charge Parson with violence or threats, calling into question the "legitimate penological reason" for the segregative confinement. See Best, 14 F. Supp. 3d at 348; Dkt. No. 27-3 at 22, 28, 41-42, 57, 62, 85, 89, 97, 102, 111, 116, 119, 121, 125, 133, 141, 147, 150, 155, 158, 162, 165, 169, 172, 176, 179, 186, 190, 194, 198, 203, 207, 211, 215, 218, 223, 227, 233, 235, 239, 242, 248, 249, 252, 256, 261, 262, 268-69, 272, 280, 283. As it appears that each of Parson's periods of confinement in keeplock and/or SHU stemmed from disciplinary infractions, and this is not debated by defendants, the undersigned will proceed under the Wolff analysis for process due to pretrial detainees subject to punitive confinement. 418 U.S. at 540.

Assessing the Wolff standards, Parson received advanced written notice of the charges against him. For each misbehavior report received, Parson was provided with a copy of the

---

[24] The undersigned was unable to locate in defendants' submissions a misbehavior report or related hearing records charging Parson with threats of violence on September 1, 2014, September 26, 2014, or November 29, 2014. Further, there is no evidence in the record that Parson was disciplined as a result of these alleged threats.

misbehavior report, which reflects that Parson either acknowledged receipt by signing or by refusing to sign. Dkt. No. 27-3 at 22, 28, 41-42, 57, 62, 85, 89, 97, 102, 108, 111, 116, 119, 121, 125, 133, 141, 147, 150, 155, 158, 162, 165, 169, 172, 176, 179, 186, 190, 194, 198, 203, 207, 211, 215, 218, 223, 227, 233, 235, 239, 242, 248, 249, 252, 256, 261, 262, 268-69, 272, 280, 283. Further, the misbehavior reports each describe the factual allegations upon which the charges are based. See id. For each misbehavior report, except where indicated below, a formal hearing was held or was waived by Parson. Dkt. No. 27-3 at 23, 27, 29, 36-37, 58, 63, 84, 94-96, 107, 112, 115, 120, 124, 134, 136-37, 142, 148, 151, 156, 159, 163, 166, 170, 173, 177, 180, 187, 191, 195, 199, 204, 208, 212, 216, 219, 224, 228-29, 232, 236, 238, 243, 245, 248, 253, 256, 260, 273, 277, 279, 282. Finally, the hearing disciplinary record for each infraction includes the evidence relied on in assessing whether Parson committed the charged infractions. See id. Parson does not contend that the notice or hearings were deficient in any way. Loosely interpreted, Parson's amended complaint may be read as arguing that he was not accorded sufficient procedural protections prior to being placed in keeplock/SHU confinement. Dkt. No. 18 at 3-5 ("summary punishment without due process," "deprived of liberty without due process of law," "summary punishment imposed on me by a correction officer acting under the color of law."). However, Parson provides no specific examples of procedural deprivations in any disciplinary proceeding.

The undersigned is unable to find in the record evidence of a hearing either held or waived for the misbehavior reports issued on September 10, 2014 involving charges of "failure to obey," "insolence," and "offenses against public order" (Unusual Incident Report # 2014-0872) and November 6, 2014 involving charges of "failure to obey," "cleanliness," and

"insolence" (Unusual Incident Report #2014-1107). Dkt. No. 27-3 at 102, 268-69. The undersigned was also unable to locate in defendants' submissions copies of the misbehavior reports connected to the hearings held on May 16, 2014 involving charges of "general violations" and "failure to obey" (Unusual Incident # 2014-0377) or November 12, 2014 involving charges of "cleanliness," "failure to obey," and "insolence" (Unusual Incident # 2014-1088). Id. at 27, 245. The May 16, 2014 hearing resulted in the imposition of one day of keeplock confinement. Id. at 27. The November 12, 2014 resulted in all charges being dismissed. Id. at 245. As the May 16, 2014 hearing resulted in confinement, due process protections were required, which included notice of the charges against him. Wolff, 418 U.S. at 540.[25] Because no misbehavior report is included in the record, the undersigned cannot discern whether the Wolff requirements were met relating to these two hearings. Further, as there is nothing in the record to support that hearings were held or waived in connection with the September 10, 2014 or November 6, 2014 misbehavior reports, the undersigned does not know whether these misbehavior reports lead to hearings that resulted in segregative confinement or restrictions that would trigger Wolff protections. However, Parson does not contend that he failed to receive a misbehavior report related to the May 16, 2014 hearing nor does he argue that he did not receive the opportunity for a hearing related to the September 10, 2014 or November 6, 2014 misbehavior reports.

In sum, the record demonstrates that Parson was accorded the proper procedural protections due to pretrial detainees under Wolff for all of the misbehavior reports excepting the May 16, 2014 hearing, the September 10, 2014 misbehavior report, and the November

---

[25] Because the November 12, 2014 hearing did not result in confinement or imposition of any sanctions, it does not appear that Parson is contesting any denial of due process associated with this hearing.

6, 2014 misbehavior report. However, even if Parson did not receive the proper procedural protections as to these specific disciplinary infractions, Parson fails to allege Gates' direct involvement in any such denials. Parson's claims against Gates are based upon supervisory liability. Construing the amended complaint liberally, Parson generally asserts that Gates was aware of "summary punishment of [Parson] as a pretrial detainee" and failed to remedy those violations. Dkt. No. 18 at 5. The record lacks evidence establishing Gates' involvement in any disciplinary proceeding. As discussed supra, the only evidence related to Gates is his decision regarding Parson's appeal of his August 2014 disciplinary sentence. However, as discussed above, Parson has failed to raise an issue of material fact with respect to being denied due process as it relates to his August 12, 2014 misbehavior report and resulting hearing. Without an underlying constitutional violation by a subordinate, there can be no supervisory liability. Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003). Accordingly, the undersigned recommends that defendants' motion for summary judgment dismissing Parson's due process claims against Gates be granted.

### C. Qualified Immunity

Defendants contends that, in the event that the Court finds that Parson has raised a genuine issue of material fact as to his excessive force or due process claims, they are entitled to qualified immunity.[26] Dkt. No. 27-12 at 27-28. Qualified immunity generally protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

---

[26]    In light of my recommendation that all claims against defendant Gates' motion be dismissed on the merits, it is unnecessary to address Gates' alternative qualified immunity arguments.

have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Aiken v. Nixon</u>, 236 F. Supp. 2d 211, 22-30 (N.D.N.Y. 2002) (McAvoy, J.), <u>aff'd</u> 80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." <u>Kaminsky v. Rosenblum</u>, 929 F.2d 922, 925 (2d Cir. 1991) (citing <u>Magnotti v. Kuntz</u>, 918 F.2d 364, 367 (2d Cir. 1990)) (additional citation omitted). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009). Only if there is a constitutional violation does a court proceed to determine whether constitutional rights were clearly established at the time of the alleged violation. <u>Id.</u> at 236.

Addressing Barboza's qualified immunity claim, it is well-settled that on August 12, 2014, the Fourteenth Amendment prohibited law enforcement officers from using excessive force against pretrial detainees. <u>See</u>, <u>e.g.</u>, <u>Toliver v. City of New York</u>, 530 F. App'x 90, 92 n.1 (2d Cir 2013); <u>Caiozzo v. Koreman</u>, 581 F.3d 63, 72 (2d Cir. 2009). Thus, because a reasonable jury could conceivably accept Parson's claim that Barboza's use of force was objectively unreasonable, Barboza is not entitled to qualified immunity for the alleged Fourteenth Amendment violation. Accordingly, it is recommended that defendant Barboza's motion be denied on this ground.

## IV. CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 27) be**:**

(1) **GRANTED** as to all of Parson's claims against defendant Gates; and

(2) **DENIED** as to Parson's excessive force claim against Barboza; and

(3) **DENIED** in all other respects; it is further

**RECOMMENDED**, that Gates be **DISMISSED** as a defendant herein; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1( c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court**. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**IT IS SO ORDERED**

Dated: June 28, 2016
Albany, New York

*Christian F. Hummel*

Christian F. Hummel
U.S. Magistrate Judge